UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MIGUEL ESTEBAN RODRIGUEZ,

        Plaintiff,

    v.

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.
_____

18-CV-6483
DECISION AND ORDER

On June 29, 2018, the plaintiff, Miguel Rodriguez, brought this action under the

Social Security Act ("the Act").  He seeks review of the determination by the

Commissioner of Social Security ("Commissioner") that he was not disabled.  Docket

Item 1.  On February 19, 2019, the plaintiff moved for judgment on the pleadings,

Docket Item 10; on April 3, 2019, the Commissioner responded and cross-moved for

judgment on the pleadings, Docket Item 12; and on April 23, 2019, the plaintiff replied,

Docket Item 13.

For the reasons stated below, this Court grants the plaintiff's motion in part and

denies the Commissioner's cross-motion.

## BACKGROUND

### I.  PROCEDURAL HISTORY

On August 19, 2014, Jaime-Marie Rodriguez ("J. Rodriguez") applied for

Children's Supplemental Security Income benefits on behalf of her minor child, Miguel

Rodriguez ("M. Rodriguez"). Docket Item 8 at 142-47. J. Rodriguez claimed that M. Rodriguez had been disabled since March 1, 2013, and was currently disabled. *Id.* 142.

On October 8, 2014, J. Rodriguez received notice that her application was denied because M. Rodriguez was not disabled under the Act. *Id.* at 103-06. She requested a hearing before an administrative law judge ("ALJ"), *id.* at 107, which was held on December 12, 2016, *id.* at 61-93. The ALJ then issued a decision on June 17, 2017, confirming the finding that M. Rodriguez was not disabled. *Id.* at 20-38. J. Rodriguez appealed the ALJ's decision and included additional evidence. *Id.* at 6. On May 2, 2018, the Appeals Council found that the additional evidence did "not relate to the period at issue" and therefore did not "affect the decision about whether [M. Rodriguez was] disabled beginning on or before [the date the ALJ rendered its decision]." *Id.* J. Rodriguez's appeal was denied, and the decision then became final. *Id.* at 5-8. On the same day that the Appeals Council denied J. Rodriguez's application, May 2, 2018, M. Rodriguez reached the majority age of 18. *Id.* at 172. Accordingly, M. Rodriguez pursued the instant appeal to this Court.

## II. CHILDREN'S DISABILITY STANDARD

A child under 18 is disabled under section 1614(a)(3)(C)(i) of the Social Security Act if he or she has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." In denying M. Rodriguez's application, the ALJ evaluated his claim under the Social Security Administration's three-step evaluation process to

determine whether an individual under the age of 18 is disabled. *See* 20 C.F.R.
§ 416.924(a).

At the first step, the ALJ determines whether the claimant is currently engaged in substantial gainful activity ("SGA"), defined as work activity that is both substantial and gainful. *Id.* § 416.972. "Substantial work activity" involves significant physical or mental activities. *Id.* § 416.972(a). "Gainful work activity" is work usually done for pay or profit, whether or not profit is realized. *Id.* § 416.972(b). If the claimant is engaged in SGA, the claimant is not disabled regardless of medical condition, age, education, or work experience. *Id.* § 416.924(b). If the claimant is not engaged in SGA, the ALJ proceeds to the next step. *Id.*

At step two, the ALJ determines whether the claimant has a medically determinable impairment or combination of impairments that is "severe." *Id.* § 416.924(a). For a claimant under the age of 18, a medically determinable impairment or combination of impairments is not severe if it is a slight abnormality or a combination of such abnormalities that causes no more than minimal functional limitations. *Id.* § 416.924(c). If the claimant has a severe impairment, the ALJ proceeds to the third step. *Id.* § 416.924(a).

At step three, the ALJ determines whether the impairment or combination of impairments meets, medically equals, or functionally equals an impairment in the listings. *Id.* § 416.924(d). If the claimant has an impairment or combination of impairments that meets, medically equals, or functionally equals the severity of one in the listings, and if such impairments have lasted or are expected to last for a continuous

period of at least 12 months, then the claimant is disabled.  *Id.* § 416.924(d).  If not, then the claimant is not disabled.  *Id.*

To determine whether impairments functionally equal one in the listings, the ALJ assesses the claimant's functioning in six separate "domains": (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being.  *Id.* § 416.926a(b)(1).  That assessment compares how the child performs in each of these domains with the typical functioning of a child of the same age without impairment.  *Id.* § 416.926a(b).  The child's impairment is of listing-level severity if there are "marked" limitations in at least two domains or an "extreme" limitation in one domain.  *Id.* § 416.926a(d).  In determining whether limitations are "marked" or "extreme," the ALJ considers functional limitations that result from all impairments, including impairments that have been deemed not severe, and their cumulative effects.  *Id.* §§ 416.923, 416.924a(b)(4), 416.926a(a), (c), and (e)(1)(i).

A "marked" limitation results when impairments "seriously interfere with [the child's] ability to independently initiate, sustain, or complete activities."  *Id.* § 416.926a(e)(2)(i).  A "marked" limitation is "more than moderate" but "less than extreme."  *Id.*  On a standardized test designed to measure abilities within a certain domain, a "marked limitation" means a score of at least two, but less than three, standard deviations below the mean and a level of day-to-day functioning consistent with that score.  *Id.* §§ 416.926a(e)(2)(i), 416.926a(e)(2)(iii).  For example, in the domain of "health and well-being," a child is considered to have a "marked" limitation if he or she is frequently ill as a result of his or her impairments or exhibits frequent

4

worsening of symptoms resulting in medically-documented exacerbations. *Id.*
§ 416.926a(e)(2)(iv). "Frequent" means episodes that occur on average every four
months and last two weeks or more, or that occur more often than three times a year
but last less than two weeks, or that occur less often but are of overall equivalent
severity. *Id.*

An "extreme" limitation, on the other hand, results when impairments "interfere[ ]
very seriously with [the child's] ability to independently initiate, sustain, or complete
activities." *Id.* § 416.926a(e)(3)(i). An "extreme" limitation is one that is "more than
marked." *Id.* The ALJ will find that a limitation is "extreme" when a comprehensive
standardized test designed to measure functioning in a particular domain results in a
score of three or more standard deviations below the mean and day-to-day functioning
consistent with that score. *Id.* § 416.926a(e)(3)(iii). In the domain of "health and well-
being," for example, the ALJ will consider a child to have an "extreme" limitation if the
child is frequently ill or if impairments frequently become exacerbated, resulting in
medically documented symptoms significantly more than those of a "marked" limitation.
*Id.* § 416.926a(e)(3)(iv).

## III.    RELEVANT MEDICAL EVIDENCE

The following summarizes the medical evidence most relevant to M. Rodriguez's
claim. M. Rodriguez was examined by a number of providers, but those reports
completed by professionals at Genesee Mental Health; professionals at Highland
Family Medicine; professionals at the Rochester City School District Committee on
Special Education; Harbinder Toor, M.D.; Kristina Luna, Psy. D.; and Corey Smith, P.T.,
are of most significance to the claim of disability here.

## A.    Genesee Mental Health

M. Rodriguez received treatment from providers at Genesee Mental Health beginning on September 1, 2010.  Docket Item 8 at 466.  His primary therapist, Lorraine Braveman, L.C.S.W., provided individual therapy once every two weeks through at least November 2016.  *Id.* at 396, 447.  The treatment focused on addressing his ADHD, bipolar disorder, and oppositional defiance disorder.  *Id.* at 283.

Records from 2016 show that M. Rodriguez had significantly progressed toward achieving his treatment goals.  For example, on August 11, 2016, his treating psychiatrist, Dorata S. Gardy, M.D., reported that M. Rodriguez had made "significant progress" toward his goal of "be[ing] able to pay attention, focus, [and] increase on task behaviors."  *Id.* at 463.   He reportedly "had a good year at school," "was able to pay attention [and] focus," and was "able to complete school assignments and homework."  *Id.* at 463.  Dr. Gardy also reported that M. Rodriguez had made "significant progress" toward his goal of "feel[ing[ happier [and] less anxious and sustain[ing] attention longer."  *Id.* at 464.  He reportedly "rate[d] his ADHD a 3 [out of 10] and happiness a 5 [out of 10]."  *Id.* at 464.  This progress persisted through at least October 27, 2016, when Ms. Braveman indicated that M. Rodriguez was "doing well . . . academically and behaviorally" and continued to make "significant progress" toward achieving his treatment goals.  *Id.* at 465-66.

## B.    Highland Family Medicine

On April 11, 2014, family medicine specialist Quang Nguyen, M.D., evaluated M. Rodriguez for a concussion following a slip-and-fall accident at school on April 4, 2014.

*Id.* at 289. The accident had resulted in a short loss of consciousness and an emergency room visit. *Id.* Dr. Nguyen prescribed melatonin, a sleep aid. *Id.* at 285.

On April 18, 2014, Dr. Nguyen again evaluated M. Rodriguez and reported that he "had negative head imagining" and that the melatonin was helping him sleep. *Id.* at 307. On June 12, 2014, Dr. Nguyen diagnosed ADHD, bipolar disorder, and migraines, *id.* at 291; prescribed dextroamphetamine for the ADHD, Risperdal for the bipolar disorder, and sumatriptan for the migraines, *id.* at 290; and referred M. Rodriguez to family medicine specialist Colleen Loo-Gross, M.D., for further treatment of his migraines, *id.*

On June 6, 2014, Dr. Loo-Gross diagnosed migraines, which M. Rodriguez reported had been occurring "intermittently since [the] concussion." *Id.* at 297. She prescribed continued use of sumatriptan. *Id.* at 298.

At some point in early 2014, M. Rodriguez injured his right knee while participating in physical education class. *Id.* at 307. On April 4, 2014, radiologist Osbert Adjei, M.D., reviewed X-ray imaging of M. Rodriguez's knee and found "[n]o definite evidence of acute fracture or dislocation" and "[n]o abnormal periosteal reactions." *Id.* at 332. A magnetic resonance image ("MRI") taken of the same knee on February 2, 2015, and reviewed by pediatric radiologist Mitchell A. Chess, M.D., showed that M. Rodriguez had a "tear in the medial portion of [his] meniscus." *Id.* at 541.

## C.    Rochester City School District Committees

On November 8, 2013, the Rochester City School District Committee on Special Education ("School Committee") completed a comprehensive evaluation of M. Rodriguez to determine whether he was eligible for special education services under the

Individuals with Disabilities Education Act ("IDEA"). Chas Devries, a school psychologist, noted that M. Rodriguez's teachers "described [him] . . . as rarely completing work in class, disruptive, easily distracted, and frequently off task." *Id.* at 276. Furthermore, he "ha[d] a failing grade in most of his classes." *Id.* at 276. A classroom observation showed that M. Rodriguez "was slow to get started [on assignments], but completed all tasks and seemed able to work independently," though his teacher commented that the day of observation "was a better day than usual for [him]" and that "he frequently ha[d] numerous minor behavior issues in class." *Id.* at 277.

The School Committee gave M. Rodriguez a battery of psycho-educational tests as part of the comprehensive evaluation. Cognitive testing using the Wechsler Intelligence Scale for Children, Fourth Edition ("WISC-IV"), showed that M. Rodriguez's full-scale IQ fell in the 47th percentile among age-group peers. *Id.* at 277. His processing speed subtest score was substantially lower than that of his peers, falling in the 7th percentile. *Id.* at 277. The evaluator noted that M. Rodriguez "may need some additional time when presented with new tasks or information." *Id.* at 278. Achievement testing using the Woodcock-Johnson Tests of Achievement, Third Edition, showed that M. Rodriguez, then in the eighth grade, had reading skills at a 6.8 grade equivalent, math skills at a 5.8 grade equivalent, and writing skills at a 7.1 grade equivalent. *Id.* at 278. His lowest score was in the area of reading fluency, in which he tested at a 4.2 grade equivalent. *Id.* at 278. Finally, social-emotional testing using the Behavior Assessment Scale for Children, Second Edition, showed that M. Rodriguez "may have some generalized anxiety," "issues with low self-esteem and poor body image,"

"difficulty with staying focused in school," and "personality clashes with some of his teachers." *Id.* at 279.  M. Rodriguez "described his moods as 'up and down.'" *Id.* at 280.

The School Committee concluded that M. Rodriguez did not require special education services given his "average range of cognitive abilities and academic skills" but recommended "[f]urther evaluation . . . to examine why [he was] completing so little work in school when he clearly appear[ed] to have the abilities to do well in most areas." *Id.* at 280.  Although M. Rodriguez was not classified as a student with special needs under the IDEA, he was provided with accommodations under section 504 of the Rehabilitation Act of 1973.  The School Committee established a plan to provide M. Rodriguez with group counseling once a week with the school social worker, extended time to complete classroom tasks, specific positive behavior enforcement protocols in his classroom, use of a graphic organizer to focus his attention during instruction, and opportunities for movement and breaks to accommodate his ADHD.  *Id.* at 273-74.

On September 3, 2014, the School Committee revisited M. Rodriguez's eligibility for IDEA classification and found that he now qualified as a student with a disability under the category of "Other Health Impairment."  *Id.* at 354.  His Individual Education Plan ("IEP") included integrated co-teaching in all his academic classes, small-group counseling with the school's social worker once a week, and a plan to provide "[r]efocusing and [r]edirection as needed throughout the school day."  *Id.* at 360.

Subsequently, on October 31, 2014, Rusty Griffith, L.M.S.W., observed M. Rodriguez in his English classroom.  He noted that when the classroom teacher asked M. Rodriguez to sit down, he "conveyed a sense of disrespect towards [her]" by

"mak[ing] inappropriate remarks." *Id.* at 368. Though the teacher refocused him, the refocus did not last long. *Id.*

### D.    Harbinder Toor, M.D.

On September 9, 2014, neurologist Harbinder Toor, M.D., completed a consultative pediatric examination of M. Rodriguez. Dr. Toor noted "[t]enderness in the right knee area" and "[s]light tenderness in the lower back." *Id.* at 392. Dr. Toor concluded that M. Rodriguez had "moderate limitations standing, walking, running, bending, [and] lifting because of pain in the right knee and the lower back." *Id.* at 393. He also opined that M. Rodriguez's "migraine headaches [could] interfere with his routine." *Id.* at 393.

### E.    Kristina Luna, Psy. D.

On September 19, 2014, Kristina Luna, Psy. D., completed a consultative psychological evaluation of M. Rodriguez. Based on M. Rodriguez's performance on the WISC-IV, Dr. Luna concluded that his overall scores fell in the average range, but she noted a significant difference between his overall abilities and his processing speed. *Id.* at 404. Dr. Luna diagnosed ADHD, as well as posttraumatic stress disorder ("PTSD") based on reported sleep issues caused by flashbacks and nightmares of traumatic events in M. Rodriguez's life. *Id.* at 396, 399. Dr. Luna opined that M. Rodriguez "ha[d] no limitations in his ability to attend to, follow, and understand age-appropriate directions, complete age-appropriate tasks, respond appropriately to changes in the environment, ask questions and request assistance in an age-appropriate manner, be aware of danger and take needed precautions, and interact adequately with peers." *Id.* at 399. He was, however, "mildly limited in his ability to

adequately maintain appropriate social behavior, learn in accordance to cognitive functioning, and interact adequately with adults." *Id.* She recommended that he continue with psychological treatment and referred him for additional psychiatric intervention. *Id.*

### F. Corey Smith, P.T.

On April 8, 2015, M. Rodriguez underwent a surgical scope of his right knee. *Id.* at 474. On June 4, 2015, Corey Smith, P.T., discharged M. Rodriguez from physical therapy after only three sessions, reporting that his "[p]ain and [range of motion] goals [had been] achieved." *Id.*

## IV. THE ALJ'S DECISION

The ALJ first determined that M. Rodriguez was under the age of 18 when the application was filed on July 17, 2014, and therefore proceeded to the three-step evaluation process for minors. *Id.* at 20. At step one, the ALJ found that M. Rodriguez had not engaged in substantial gainful activity since the application date. *Id.* at 23. At step two, the ALJ found that M. Rodriguez suffered from five severe impairments: ADHD, a learning disorder, bipolar disorder, depression, and anxiety. *Id.* Although the ALJ found these impairments to be severe, at step three he determined that they did not meet or equal any of the Childhood Listings in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* Specifically, the ALJ determined that M. Rodriguez's mental impairments did not meet or functionally equal listing 112.02 (organic mental disorders, including learning disorders); listing 112.04 (mood disorders, including depressive and bipolar disorders), or listing 112.11 (neurodevelopmental disorders, including ADHD).

In addressing M. Rodriguez's symptoms, the ALJ followed a two-step process to evaluate whether (1) there was an underlying medically determinable physical or mental impairment that could be expected to produce his symptoms and (2) the intensity, persistence, and limiting effects of his symptoms interfered with his functioning. *Id.* at 24-25. As part of his analysis, the ALJ addressed M. Rodriguez's abilities in each of the six domains and found that while his "medically determinable impairments could reasonably be expected to produce the alleged symptoms . . . , [J. Rodriguez's and M. Rodriguez's] statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." *Id.* at 25. For example, in the domains of acquiring and using information, attending and completing tasks, and interacting and relating with others, the ALJ found "less than marked limitations." *Id.* at 29, 31, 33. In the domains of moving about and manipulating objects, caring for self, and health and physical well-being, the ALJ found "no significant limitations." *Id.* at 35, 36, 37.

In reaching his determination, the ALJ accorded "great weight" to the opinion of the consultative psychologist, Dr. Luna. The ALJ found that her "opinion [was] consistent with the other evidence of record and her clinical findings and examination." *Id.* at 26. The ALJ gave only "partial weight" to the opinion of the consultative physician, Dr. Toor, that M. Rodriguez had moderate physical limitations and that his migraines could interfere with his routine because these conclusions were "only partially consistent with the medical evidence of record and clinical findings on examination." *Id.* at 26-27.

## STANDARD OF REVIEW

"The scope of review of a disability determination . . . involves two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). The court "must first decide whether [the Commissioner] applied the correct legal principles in making the determination." *Id.* This includes ensuring "that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the Social Security Act." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)). Then, the court "decide[s] whether the determination is supported by 'substantial evidence.'" *Johnson*, 817 F.2d at 985 (quoting 42 U.S.C. § 405(g)). "Substantial evidence" means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to correct legal principles." *Johnson*, 817 F.2d at 986.

## DISCUSSION

### I.     THE PLAINTIFF'S CLAIMS

M. Rodriguez advances two arguments. First, he argues that the ALJ failed to fulfill his independent duty to develop the record by not obtaining additional information from M. Rodriguez's classroom teachers and knee surgeon. Docket Item 10-1 at 10-12.

Second, he argues that the ALJ failed to adequately consider how M. Rodriguez's obesity affected his functioning in each of the six domains. *Id.* at 12-14. For the reasons that follow, the Court agrees with the second argument and accordingly remands the matter for reconsideration of M. Rodriguez's functioning in each of the six domains.

### A. Duty to Develop the record

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citing *Echevarria v. Sec'y of Health & Human Servs.*, 686 F.2d 751, 755 (2d Cir. 1982)); *see also Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (same); 42 U.S.C. § 423(d)(5)(B) (requiring that the Commissioner, prior to rendering any eligibility determination, "make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, including diagnostic tests, necessary in order to properly make such determination"). Thus, "where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history 'even when the claimant is represented by counsel or . . . by a paralegal.'" *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (quoting *Perez*, 77 F.3d at 47); *see also Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990) ("[W]hen the claimant is unrepresented, the ALJ is under a heightened duty 'to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.'" (quoting *Echevarria v. Sec'y of Health & Human Svcs.*, 685 F.2d 751, 755 (2d Cir. 1982))). On the other hand, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical

history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa*, 168 F.3d at 79 n.5 (quoting *Perez*, 77 F.3d at 48)).

The Social Security Administration's own regulations reflect this duty, stating that "[b]efore we make a determination that you are not disabled, we will develop your complete medical history . . . [and] will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports." 20 C.F.R. § 404.1512(d)(1). The regulations explain that "every reasonable effort" means that "we will make an initial request for evidence from your medical source or entity that maintains your medical source's evidence," and, "at any time between 10 and 20 calendar days after the initial request, if the evidence has not been received, we will make one follow-up request to obtain the medical evidence necessary to make a determination." *Id.* § 404.1512(d)(1)(i) (emphasis added).

### 1. Mental Impairments

M. Rodriguez first argues that the ALJ erred by not contacting any of his classroom teachers to obtain further insight into his mental limitations. M. Rodriguez is correct that although teachers are considered "other source[s]," *see* 20 C.F.R. § 416.913(d)(2), whose opinions cannot "establish the existence of a medically determinable impairment," an opinion from a non-medical source "who has seen the claimant in his or her professional capacity may, under certain circumstances, properly be determined to outweigh the opinion from a medical source," *see* Titles II and XVI: Considering Opinions and Other Evidence from Sources Who Are Not "Acceptable Medical Sources" in Disability Claims, 71 Fed. Reg. 45,593, 45,596 (Aug. 9, 2006). This could occur, for example, when the non-medical source "has seen the

individual more often and has greater knowledge of the individual's functioning over time" and that source's opinion has "better supporting evidence and is more consistent with the evidence as a whole." *Id.* Moreover, the Second Circuit has cautioned that because "[c]ycles of improvement and debilitating symptoms [of mental illness] are a common occurrence, . . . it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is [not disabled]." *Estrella v. Berryhill*, 925 F.3d 90, 97 (2d Cir. 2019) (second alteration in original) (quoting *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014)). This caution is particularly relevant in cases such as this where the claimant has been diagnosed with bipolar disorder.

The Court nevertheless disagrees that these considerations point to error in this case. The ALJ reviewed dozens of progress notes from M. Rodriguez's treating therapist completed over a span of five years. *See* Docket Item 8 at 27-28. He also reviewed two IEPs, each of which included classroom observation reports prepared by a licensed social worker. *See id.* Although the opinions of classroom teachers may have provided additional gloss on M. Rodriguez's behavioral struggles, there is no reason to believe they would have changed the outcome of his disability application.

Moreover, M. Rodriguez's treating therapist's notes indicate that his classroom behavior and academic performance improved in response to therapy and medication. *See id.* at 463-66. Testing conducted in advance of his IEPs and by Dr. Luna indicates that his cognitive functioning was within the average range. *Id.* at 277, 354. And notes from two classroom observations indicate that although M. Rodriguez struggled to remain on task, redirection was effective in refocusing his attention. *See id.* at 277, 368.

In short, because "there [was] no obvious gap[ ] in the administrative record," and

because "the ALJ already possesse[d] a 'complete medical history'" concerning M.

Rodriguez's mental impairments, the ALJ was "under no obligation to seek additional

information in advance of rejecting [the instant] benefits claim." *See Rosa*, 168 F.3d at

79 n.5 (quoting *Perez*, 77 F.3d at 48)).

### 2.      Physical Impairments

M. Rodriguez also argues that the ALJ failed in his duty to develop the record by

not obtaining additional information regarding his right knee injury.  Even if this were

error, it was not harmful and therefore does not require remand.  *See Zabala v. Astrue*,

595 F.3d 402, 410 (2d Cir. 2010) (declining remand when "application of the correct

legal principles to the record could lead [only to the same] conclusion"); *Pritchett v.*

*Berryhill*, No. 17-CV-719 (HBS), 2018 WL 3045096, at *7 (W.D.N.Y. June 20, 2018)

("Ultimately, the duty to [develop the record] does not arise unless the record is

insufficient for the ALJ to determine whether a claimant is disabled.").

M. Rodriguez argues that had the ALJ obtained more information regarding his

knee injury, he would have found an extreme impairment in either the domain of moving

about and manipulating objects or the domain of health and physical well-being (or a

marked limitation in both).  Docket Item 10-1 at 12.  But the record does not support that

argument.

M. Rodriguez injured his right knee when he fell on April 4, 2014.  Docket Item 8

at 289.  On September 9, 2014, Dr. Toor noted tenderness in that knee but also found

that M. Rodriguez did not require any help getting on and off the examination table and

was able to run with only slight discomfort and with a normal gait.  *Id.* at 391.  An MRI

taken on February 1, 2015, showed a "tear in the medial portion of [M. Rodriguez's] meniscus." *Id.* at 541-42. At some point between February 2015 and June 2015, M. Rodriguez underwent a surgical scope procedure to repair the damage to his knee. *Id.* at 474. On June 4, 2015, after only three post-surgery physical therapy sessions, the physical therapist discharged M. Rodriguez, noting that he had achieved all his treatment goals, that he continued to have only "mild weakness" in his knee, and that his prognosis was "excellent." *Id.* at 474. On July 21, 2016, November 13, 2015, and January 1, 2016, treatment notes described M. Rodriguez's gait as normal. *Id.* at 426, 481, and 497. And on December 12, 2016, when asked during the hearing whether M. Rodriguez had "any problems with . . . basic coordination, walking, running, [or] jumping," J. Rodriguez responded "[n]o . . . [h]e just chooses not to." *Id.* at 79.

So the physical therapist who treated M. Rodriguez after his surgery concluded that M. Rodriguez's knee had fully recovered, his mother apparently concurred in that assessment, and no progress notes after his surgery suggest anything different. Therefore, there is no reason to believe that had the ALJ obtained additional information about M. Rodriguez's right knee, that information would have changed the outcome of M. Rodriguez's application for disability benefits.

In sum, the duty to contact does not arise merely because the claimant has suffered an injury or has undergone a medical procedure. Rather, there must be evidence suggesting an ongoing impairment that is not otherwise adequately discussed in the record—that is, there must be a "deficienc[y] in the record," *see Rosa*, 168 F.3d at 79. Here, there was nothing—in any of the treating or consultative examiner's notes or

in the claimant's mother's testimony—suggesting that the ALJ should have followed up to obtain more information regarding the functioning of M. Rodriguez's right knee.

### B.    M. Rodriguez's Obesity

M. Rodriguez also argues that the ALJ erred procedurally in failing to consider the impact of M. Rodriguez's obesity on his functioning in each of the six domains. Docket Item 10-1 at 12-14.  The Court agrees with M. Rodriguez on this issue and remands the matter for that reason.

Social Security Ruling 02–1p explicitly "requires an ALJ to consider the effects of obesity" when assessing a claimant's performance in each of the functional domains, especially because "the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately."  *DeWitt v. Astrue*, 381 F. App'x 782, 785 (10th Cir. 2010) (summary order) (second quoting Titles II and XVI: Evaluation of Obesity, 67 Fed. Reg. 57,859, 57,861-62 (Sept. 12, 2002)). The regulations define "three levels of obesity": Level I includes body mass indexes ("BMIs") of 30.0-34.9; Level II includes BMIs of 35.0-39.9; and Level III includes BMIs greater than or equal to 40.  Titles II and XVI: Evaluation of Obesity, 67 Fed. Reg. 57,859-02 at 57,860.  "When the evidence in a case does not include a diagnosis of obesity, but does include clinical notes or other medical records showing consistently high body weight or BMI . . . [, an ALJ] will [generally] use [his or her] judgment to establish the presence of obesity based on medical findings and other evidence in the case record."  *Id.* at 57,861.  "As with any other impairment, [the ALJ] will explain how [the ALJ] reached [his or her] conclusions on whether obesity caused any physical or mental limitations."  *Id.*

The Commissioner does not dispute that M. Rodriguez's medical records indicated obesity. *See* Docket Item 11 at 12-13. Nor could he. Numerous records show that M. Rodriguez's BMI placed him squarely in the range of obesity, including the most recent records showing that he fell into—or was precariously close to—the most extreme category of "Level III" obesity.[1] The Commissioner also does not dispute that the ALJ did not "explicitly discuss" the effect of M. Rodriguez's obesity on his functioning—or, in fact, address obesity at all. *Id.*

Instead, the Commissioner argues that the ALJ met the requirements of Ruling 02-1p because he "implicitly considered [M. Rodriguez's] obesity by assigning partial weight to Dr. Toor's opinion, which refer[ed] to [M. Rodriguez's] weight, relative to his height." *Id.* at 13. The Court disagrees that simply by addressing an opinion that obliquely implicated obesity, the ALJ can be assumed to have considered the impact of that obesity. *Cf. Wilson v. Colvin*, No. 14-CV-5666 (DF), 2015 WL 5786451, at *30 (S.D.N.Y. Sept. 29, 2015) (finding ALJ's failure to explicitly discuss the claimant's obesity harmless because the ALJ "adopt[ed] the limitations suggested by physicians who . . . *directly* considered the effects of obesity in their opinions" (emphasis added)).

Although Dr. Toor recorded M. Rodriguez's height and weight, he did not "explain how [he] reached [his] conclusions on"—or even address—"whether obesity caused any physical or mental limitations," *see* Titles II and XVI: Evaluation of Obesity, 67 Fed. Reg.

---

[1] *See, e.g.*, Docket Item 8 at 508 (progress note dated May 4, 2016, indicating "obese child weight"); *id.* at 519 (progress note dated September 14, 2016, indicating "obese child weight"); *id.* at 487 (progress note dated November 11, 2015, indicating a BMI of 34.56); *id.* at 491 (progress note dated December 16, 2015, indicating a BMI of 36.33); *id.* at 512 (progress note dated June 18, 2016, indicating a BMI of 40.66) *id.* at 516 (progress note dated July 13, 2016, indicating a BMI of 39.37); *id.* at 518 (progress note dated September 26, 2016, indicating a BMI of 43.15).

57,859 at 57,861. In fact, Dr. Toor apparently never used the words "obesity" or "overweight" or otherwise analyzed how M. Rodriguez's weight might affect his functioning. *See* Docket Item 8 at 390-94. Likewise, Dr. Luna, to whose opinion the ALJ accorded "great weight" in determining M. Rodriguez's mental limitations, *see id.* at 26, never even referred to M. Rodriguez's weight or how it might impact his mental functioning. The failure to address obesity was a critical mistake. *See* Titles II and XVI: Evaluation of Obesity, 67 Fed. Reg. at 57,861 ("Obesity may also cause or contribute to mental impairments such as depression. The effects of obesity may be subtle, such as the loss of mental clarity and slowed reactions that may result from obesity-related sleep apnea.").

The Commissioner therefore may not rely on either professional's report as evidence that the ALJ implicitly complied with the mandates of Ruling 02-1p. Indeed, because neither of those reports addressed obesity-related issues, the ALJ was under a duty to obtain additional evaluations so that he could consider and address M. Rodriguez's obesity. That requirement was at its height in this case because the claimant proceeded pro se and may not have known enough to raise the issue. *See Cruz*, 912 F.2d at 11. For that reason, the case is remanded so that the ALJ may consider how M. Rodriguez's obesity affects his functioning in each of the six domains.

## **CONCLUSION**

For the reasons stated above, the Commissioner's motion for judgment on the pleadings, Docket Item 12, is DENIED, and M. Rodriguez's motion for judgment on the pleadings, Docket Item 10, is GRANTED in part and DENIED in part. The decision of the Commissioner is VACATED, and the matter is REMANDED for further administrative proceedings consistent with this decision.


SO ORDERED.

Dated:     November 14, 2019
           Buffalo, New York


                                        _/s/ Lawrence J. Vilardo_____
                                        LAWRENCE J. VILARDO
                                        UNITED STATES DISTRICT JUDGE